Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

*[Additional counsel on signature page]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JUN SHI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMPIO PHARMACEUTICALS, INC., MICHAEL MACALUSO, and THOMAS E. CHILCOTT,<br><br>Defendants. | **Case No:** 2:18-cv-07476-SJO-RAO<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff George Nikolaou and named plaintiff Dean Geraci ("Plaintiffs") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange

Commission ("SEC") filings, wire and press releases published by and regarding Ampio Pharmaceuticals, Inc. ("Ampio" or the "Company"), analysts' reports and advisories about the Company, interviews with witnesses, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Ampio between May 1, 2017 and August 7, 2018, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Defendant Ampio is a developmental stage biopharmaceutical company that focuses on development of therapies for prevalent inflammatory conditions in the United States.

3. Ampio's main product in its pipeline is Ampion-- an intra-articular injection which attempts to treat osteoarthritis of the knee.

4. Ampio's goal is to secure approval from the U.S. Food and Drug Administration ("FDA") of a Biologics License Application ("BLA") for Ampion. Approval of a BLA by the FDA will allow Ampio to commercialize Ampion.

5. The FDA has informed Ampio that the Company needs two successful Ampion Phase 3 pivotal trials to submit a BLA.

6. Ampio first conducted a Phase 3 pivotal trial for Ampion in 2013, called the SPRING Trial—which had 329 participants.

7. According to Ampio, the FDA stated that the SPRING Trial was adequate and well-controlled and could serve as the first of the two requisite Phase 3 trials for the BLA.

8. The FDA directed the Company to complete another Phase 3 pivotal trial to "confirm the effect size" of the SPRING Trial.

9. Since then, Ampio has been unable to replicate the success of the SPRING Trial. Ampio announced two unsuccessful Phase 3 pivotal trials. The first trial, called the STEP Trial, with 538 patients, failed due the improper handling of materials which interfered with efficacy analysis. The other, called the PIVOT Trial, with 480 patients, failed because the trial failed to show that Ampion was superior to saline in treatment of osteoarthritis of the knee.

10. Both the STEP and PIVOT trials had significantly more participants than the SPRING trial—consistent with the FDA's directive to "confirm the effect size" of the SPRING Trial.

11. At the same time, Ampio was struggling to fund operations. Ampio has not and does not generate any revenues. Prior to and during the Class Period, Ampio's auditor expressed concerns about Ampio's ability to continue to exist as a going concern.

12. Ampio relies on financing and equity sales to fund continue operations. Thus, at all relevant times it was important to Ampio to deliver good news and show investors progress.

13. Against this backdrop, the Class Period begins on May 1, 2017, when Ampio announced that it was going to try another Phase 3 pivotal trial for Ampion, called AP-003-C. On this news, Ampio's stock price rose over 28%, from $0.56 per share to $0.72 per share.

14. AP-003-C would be a small study, with only 168 participants. Ampio would inject some participants with saline, but any data garnered from these saline patients would not be used. There would be no control group. Instead, the trial would compare the data from Ampion treated patients against data from those injected with saline in historical Ampion trials.

15. As one witness, Ampio's former Chief Regulatory Affairs Officer, has described, and as the FDA has cautioned, demonstrating efficacy using historical data is significantly more difficult and is reserved for special circumstances not present here.

16. Defendants implied that, through a series of communications with FDA representatives, the agency had approved or endorsed the design of AP-003-C, and if the trial successfully met its endpoints, the Company would be able to submit its BLA.

17. On December 14, 2017, Ampio announced that the AP-003-C Phase 3 trial had successfully met its primary and secondary endpoints. On this news, Ampio's stock price rose over 33%, from $1.75 per share to $2.33 per share.

18. Unbeknownst to investors, throughout the Class Period, Defendants falsely maintained that AP-003-C was one of the two pivotal trials that Ampio could rely upon in support of their BLA.

19. Contrary to Defendants' Class Period statements, Defendants knew or were reckless in not knowing that AP-003-C was inadequate and not well controlled. Defendants misrepresented their communications with the FDA regarding the agency's approval of the design of the AP-003-C trial.

20. The truth was revealed on August 7, 2018, when Ampio announced that, after meeting with the FDA in late July, the agency had informed them that AP-003-C was not an adequate and well-controlled trial. The FDA also recommended the

Ampio conduct an additional Phase 3 trial for Ampion with a concurrent control group and recommended that Ampio obtain a Special Protocol Assessment agreement for its next trial.

21. On this news, shares of Ampio fell $2.25 per share or over 78% to close at $0.61 per share on August 8, 2018. Shares continued to fall another 21.3% the next day.

22. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

24. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

25. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Ampio conducts business in this District and the alleged misstatements entered and subsequent damages took place within this District.

26. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

27. Lead Plaintiff George Nikolaou purchased Ampio common stock during the Class Period as set forth in his shareholder certification incorporated by reference

herein, (Dkt. 20-2), and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

28. Named Plaintiff Dean Geraci purchased the Company's securities at artificially inflated prices during the Class Period as set forth in its shareholder certification, attached hereto as Exhibit 1, and has been damaged thereby.

29. Defendant Ampio is a Delaware corporation headquartered in Englewood, Colorado. It is a biopharmaceutical company which focuses on the development of therapies for the treatment of prevalent inflammatory conditions in the United States. The Company's stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AMPE."

30. Defendant Michael Macaluso ("Macaluso") has served as Ampio's Chief Executive Officer ("CEO") and Chairman of the Board at all relevant times.

31. Defendant Thomas E. Chilcott ("Chilcott") served as Ampio's Chief Financial Officer ("CFO") and Treasurer from August 16, 2017 until June 12, 2019.

32. Defendants Macaluso and Chilcott are collectively referred to hereinafter as the "Individual Defendants."

33. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

34. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

35. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

36. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

37. Ampio's predecessor, DMI Life Sciences, Inc., was founded in 2008 by Defendant Macaluso. In March 2010, DMI merged with a subsidiary of Chay Enterprises, a publicly traded development stage company in the business of land development. The resultant entity reincorporated and changed its name to Ampio Pharmaceuticals, Inc. On March 29, 2010, shares of Ampio began trading on the NYSE under the ticker symbol "AMPE."

38. Ampio has two drugs in its pipeline: Ampion and Optina.

39. Ampio has not conducted a clinical trial for Optina since 2015.

40. Ampion is the only drug in the pipeline under development. Ampio is pouring all its efforts and resources into Ampion.

41. Ampio explained that in its Annual Report for fiscal year ended December 31, 2017 that it is "currently focusing [its] resources and clinical development efforts on Ampion to treat osteoarthritis of the knee, our highest priority." Ampion is the only drug in the pipeline under development.

42. Ampion's primary constituent ingredient is known as aspartyl-alanyl diketopiperazine, or DA-DKP. DA-DKP is a naturally occurring human molecule present in the body that can be detected in plasma.

43. DA-DKP is believed to have significant effects on inflammation and other physiological and metabolic parameters. The Company describes Ampion as "the < 5 kDa ultrafiltrate of 5% Human Serum Albumin" that "is a non-steroidal, low molecular weight, anti-inflammatory biologic, which has the potential to be used in a wide variety of acute and chronic inflammatory conditions, as well as immune-mediated diseases."[1] Human Serum Albumin is an approved biologic product; Ampio is attempting to reposition it to treat OAK .

44. Since at least 2011, the Company has been developing Ampion for the treatment of pain due to osteoarthritis of the knee ("OAK") and other inflammatory conditions.

45. OAK is caused by inflammation of the soft tissue and bony structures of the joint, which worsens over time and leads to thinning of cartilage.

46. The most common way of classifying severity of OAK is the five grade Kellgren and Lawrence ("KL") system, with KL 0 being the least severe and KL IV being the most severe. Ampion is aimed at treating KL Grades II to IV.

[1] 2017 Annual Report

47. According to Ampio, the market opportunity for Ampion is huge. Ampio states that symptomatic OAK is expected to impact 1 in 2 Americans and that the incidence of developing OAK over a lifetime is approximately 45%. The global market for moderate to moderately severe osteoarthritis is over $3 billion, but Ampio explains that this does not account for severely diseased patients, so the market could be even larger.

48. According to Ampio, none of the current treatment options available for OAK, including non-steroidal anti-inflammatory drugs, opioids, pain patches, corticosteroids, and HA injections, adequately meet the needs of the market.

49. The Company has explained that "Ampion is a novel treatment that, if approved, would be the first non-steroidal, non-hyaluronic-based intra-articular treatment available for the treatment of pain due to osteoarthritis of the knee."[2] In 2013, the FDA granted an active Investigational New Drug application for Ampion for treatment of pain due to OAK.

50. As a developmental stage biotech company, Ampio "has not yet generated any revenues or profits to date."[3] It is burning cash. From 2013 to 2017, it had over $107.7 million in total operating expenses, and had a net loss of over $165 million.[4]

**<u>The FDA Approval Process</u>**

51. Ampio's primary goal is to submit a BLA to the FDA for Ampion to treat OAK.

52. A BLA is a request for permission to introduce a biologic product into interstate commerce. That is, once a company receives a BLA, it can begin to market its product.

---

[2] Id.
[3] 3Q 2019 Quarterly Report
[4] 2018 Annual Report

a. Typically, there is a pre-submission meeting between the applicant and the FDA at least two months prior to the planned submission. The purpose of this meeting is to discuss the planned content of the BLA with the appropriate review division.

b. The BLA must include all preclinical, clinical, and other testing and a compilation of data relating the product's pharmacology, chemistry, manufacture, and controls.

c. After the submission, the FDA has 60 days to review the application to determine whether it is sufficiently complete to permit substantive review.

d. The FDA provides novel biologics twelve years of market exclusivity against would-be "biosimilar" competitors.

53. Clinical trials conducted for purposes of supporting a BLA (or New Drug Application) are conducted in three sequential phases.[5]

a. **Phase 1:** The purpose of a Phase 1 trial is to determine safety and dosage. The drug or biologic will usually be administered to a small group healthy volunteers who are closely monitored over several months to gather information about how the drug interacts with the human body.

b. **Phase 2:** These trials are aimed at determining efficacy and side effects. The drug will be administered to a group of patients with the disease for which the drug is being developed. These studies are limited to up to several hundred patients, and typically last several months to up to two years. The studies are not large enough to show whether the drug will be beneficial.

---

[5] https://www.fda.gov/patients/drug-development-process/step-3-clinical-research

c. **Phase 3:** The goal of a Phase 3 trial is to determine efficacy and monitor adverse reactions. Researchers will design Phase 3 trials to determine whether the product offers a treatment benefit to a specific population. These studies typically involve 300 to 3,000 participants, and last one to four years. Because these studies are larger and longer, they can detect less common side effects.

54. FDA regulations provide that an "adequate and well-controlled study" is characterized by, among other things, the use of "***a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect***," "the method of selection of subjects provides adequate assurance that they have the disease or condition being studied, or evidence of susceptibility and exposure to the condition against which prophylaxis is directed," "the method of assigning patients to treatment and control groups minimizes bias and is intended to assure comparability of the groups with respect to pertinent variables," and "adequate measures are taken to minimize bias on the part of the subjects, observers, and analysts of the data."[6]

55. Ampio has variously represented that the FDA requires of them two well-controlled and adequate Phase 3 pivotal trials to complete and submit a BLA.

**<u>Ampion's Checkered Clinical Trial History</u>**

56. When conducting clinical studies to test Ampion's efficacy, Ampio has used saline as a control, or placebo.

57. When saline is utilized as a control, Ampio must show that Ampion is more effective than saline to a statistically significant degree.

58. Confidential Witness 1 ("CW 1") was Chief Regulatory Affairs Officer at Ampio from 2010 to mid-2016. He reported directly to Defendant Macaluso. CW1 explained that a problem that the Company was facing in design of its clinical trials

[6] 21 C.F.R. § 314.126(b).

was that saline is proven to have a beneficial impact on the joint. That is, saline is not a pure placebo.

59. Ampio stated that they have accomplished one of the two required successful trials in AP-003-A (the "SPRING Study"), conducted in 2013. According to Ampio, the trial successfully met its endpoints, and showed that the drug was more effective than the control, saline. In the Company's 2017 Annual Report, they described the results of the trial as follows:

> In the second half of 2013, we announced the results of our positive single injection Phase III pivotal trial, the SPRING study. This study of Ampion focused on the treatment of pain due to osteoarthritis of the knee. The results of this study establish the safety and efficacy of Ampion for reduction of pain due to OA of the knee at 12 weeks after a single intra-articular injection. The SPRING study was a U.S. multicenter, randomized, double-blind, vehicle controlled trial. Three hundred twenty-nine patients were randomized to receive one of two doses (4 mL or 10 mL) of Ampion or corresponding saline control via intra-articular injection. Both doses of Ampion, 4 mL and 10 mL, showed a statistically significant reduction in pain compared to the control, and there were no significant differences between the efficacy of the two Ampion doses. As such, the lowest required dose, 4 mL, was selected as the optimal dose. Patients who received Ampion experienced, on average, greater than a 40% reduction in pain from baseline at 12 weeks. Patients who received Ampion also showed a significant improvement in function and quality of life (quality of life was assessed using the Patient Global Assessment, or PGA) compared to patients who received saline control at 12 weeks. Furthermore, the trial included severely diseased patients (defined as Kellgren-Lawrence IV). From this patient population, those patients who received Ampion had a significantly greater reduction in pain than those who received the saline control. Ampion was well tolerated with minimal adverse events, or AEs, reported across Ampion and saline groups in the study. There were no drug-related serious adverse events, or SAEs.

60. In a press release dated December 2, 2013, Ampio represented that the FDA had informed the Company that SPRING Study was one of the two required

well-controlled and adequate trials the Company could submit for Ampion's BLA. The Company stated that the "***FDA recommends that Ampio conduct an adequately powered study to confirm the effect size of [SPRING]*** and design the study to obtain information on the duration of action and repeat dosing." (Emphasis added.)

61. A powered study means a test of sufficient size to find a statistically significant difference between two populations. Power depends on both the sample size (the number of participants) and the effect size (the difference between the two populations). Clinical studies test a sample of patients with a particular characteristic, rather than the whole population. That sample is used to draw inferences about the whole population. Sufficient data must be collected to determine that any observed difference between the two populations is not due to coincidence.

62. The Company has been unable to replicate the success of the SPRING Study. There were three subsequent Phase 3 failures, the STEP Trial, the PIVOT Trial, and AP-003-C.

63. In 2014, Ampio attempted to conduct a Phase 3 Trial for Ampion that it called the STEP Trial. 538 Patients enrolled for the trial, which was to be "a randomized, placebo-controlled, double-blind study in which patients with osteoarthritis knee pain were randomized to receive either a 4 mL single injection of Ampion™ or saline control."[7]

64. The STEP Trial failed because, according to Ampio, there was a "break down in temperature management during the drug distribution process." The trial and any results derived therefrom were completely unusable.

65. On September 22, 2015, the Company announced that it had agreed with the FDA on a Special Protocol Assessment for its next Phase 3 trial, numbered AP-003-B, which Ampio called the PIVOT Trial.

---

[7] Ampio's 2014 Annual Report.

66. A Special Protocol Assessment ("SPA") is a process in which sponsors may ask to meet with the FDA to reach agreement on the design and size of certain clinical trials to determine if they adequately address scientific and regulatory requirements for a study that could support marketing approval.

67. A SPA indicates concurrence by the FDA with the adequacy and acceptability of specific critical elements of the overall protocol design. These elements are critical to ensuring that the trial can be considered adequate and well-controlled.[8] In Ampio's 2017 Annual Report, the Company acknowledged that a "SPA can significantly de-risk the path to market due to insufficient data or unexpected safety concerns."

68. Ampio described the PIVOT study as "a randomized, vehicle controlled, double-blind study, planned to have approximately 484 patients with osteoarthritis knee pain who are randomized to receive either a 4mL single injection of Ampion or saline control."[9] The primary objective of the trial was "to evaluate the efficacy of 4 mL Ampion versus 4 mL placebo intra-articular injection in improving knee pain, when administered to patients suffering from OA of the knee."[10]

69. In a press release dated March 26, 2016, Defendant Macaluso described the trial as "clinically identical to the previously successful SPRING Study, which was confirmed by the agency as one of the two pivotal trials required for approval." He further noted that the "written guidance from the FDA required 464 patients, powered at 88%."

70. On June 30, 2016, Ampio announced that the PIVOT Trial had failed to meet its primary endpoint. Specifically, it failed to show that Ampion reduced pain in

[8] FDA, Special Protocol Assessment Guidance for Industry, *available at* https://www.fda.gov/media/97618/download.
[9] Ampio's 2015 Annual Report.
[10] https://clinicaltrials.gov/ct2/show/NCT02556710.

OAK sufferers as compared to the placebo, a saline solution. The Company did not disclose whether the study succeeded in reaching its secondary endpoints.

**Ampio's Desperate Financial Situation; the Announcement and Commencement of the AP-003-C Trial; and Defendants False Statements to Investors**

71. Phase 3 Trials are expensive. According to a study published in JAMA Internal Medicine, the average cost of a Phase 3 trial in 2015-2016 was $19 million.[11] The median cost per patient was $41,117, and median cost per patient visit was $3,562.[12] The study also found that "pivotal trials were expensive when the ***benefits of a new agent were similar to those of agents already available with well-established clinical benefits***." Ampion provides a similar benefit for treatment of OAK as saline. As Ampio has acknowledged, "[h]uman clinical trials are very expensive, time-consuming, and difficult to design, implement and complete."[13]

72. On August 26, 2016, Ampio announced in a press release the closing of a registered direct offering to an institutional investor. The August 26, 2016 Press Release reported that the offering consisted of a "registered sale of 5,000,000 shares of common stock and accompanying warrants to purchase up to 5,000,000 shares of common stock with an exercise price of $1.00 per share, at a combined purchase price of $0.75 per share and accompanying warrant. The gross proceeds to the Company will approximate $3,750,000." Defendants stated that Ampio intended to "use the net proceeds from this offering for general corporate purposes as well as advancing the BLA for Ampion™ and its future clinical trials."

---

[11] Thomas Moore, et al., *Estimated Costs of Pivotal Trials for Novel Therapeutic Agents Approved by the US Food and Drug Administration, 2015-2016*, JAMA Intern Med. 2018;178(11):1451–1457.

[12] *Id.*

[13] Ampio's 2017 Annual Report.

73. The Company's 2016 Annual Report on Form 10-K contained a paragraph from its independent registered public accounting firm expressing its doubt about Ampio's ability to continue existing as a going concern. The 2016 10-K addressed the paragraph, stating the following:

> In their report accompanying our audited financial statements, our independent registered public accounting firm expressed substantial doubt as to our ability to continue as a going concern. A "going concern" opinion could impair our ability to finance our operations through the sale of debt or equity securities or through bank financing. We have raised over $100 million in equity financing in the past and believe that we will be able to raise additional equity or debt financing in the future but the financing could be extremely dilutive to our current shareholders. Our ability to continue as a going concern will depend on our ability to obtain the additional financing. Additional capital may not be available on reasonable terms, or at all. If adequate financing is not available, we would be required to terminate or significantly curtail our operations, or enter into arrangements with collaborative partners or others that may require us to relinquish rights to certain aspects of our products or product candidates, or potential markets that we would not otherwise relinquish. If we are unable to achieve these goals, our business would be jeopardized and we may not be able to continue operations.

74. Indeed, as of December 31, 2016, the Company only had "$4.9 million of cash which we expect can only fund our operation through the first five or six months of 2017." The Company required at least $12 million additional financing just to operate as planned in fiscal 2017 and into 2018. The Company's 2016 10-K continued to describe the Company's reliance on additional funding, and difficulty:

> Developing pharmaceutical products, including conducting pre-clinical studies and clinical trials, is a very time-consuming, expensive and uncertain process that takes years to complete. We expect our expenses could increase in connection with our ongoing activities, particularly as we initiate new clinical trials, prepare to file our Ampion BLA with the FDA and seek marketing approval for our product candidates.

75. The Class Period begins on May 1, 2017, when Ampio announced that it had initiated a new Phase 3 clinical trial for Ampion, numbered AP-003-C. In the press release, the Company quoted Dr. David Bar-Or, Ampio's Chief Science Officer, who described the trial as follows:

> In compliance with FDA guidance, ***this trial will be smaller than our prior trials with 171 patients,*** randomization of 6 to 1 (Ampion™/Saline) on patients with severe OAK, defined radiologically as KL 4 patients. The 6-1 randomization will preserve blinding and prevent the bias in the assessment that might be associated with an unblinded evaluation; however***, only Ampion™ treated patients will be evaluated.*** This 12-week study will evaluate the responder rate of Ampion™ treated patients as defined by OARSI, which includes pain, function, and patient global assessment (PGA). The outcome of this study will contribute to the label of Ampion™ which may include pain, function, and patient global assessment. ***Using the OMERACT-OARSI responder rate definition and the analysis proposed in this protocol, all previous Ampion™ single injections clinical trials would have successfully met this endpoint.***

(Emphasis added.)

76. The May 1, 2017 Press Release was false and/or misleading because: (1) Defendants knew or should have known that the AP-003-C was not designed to be an adequate or well-controlled study because of its low participation and lack of a concurrent control group; (2) AP-003-C's design was not formally or informally approved by the FDA.

77. On June 7, 2017, Ampio announced in a press release the closing of a second registered direct offering. The June 7, 2017 Press Release reported that the offering consisted of "990,245 shares of common stock and warrants to purchase up to 10,990,245 shares of common stock." Defendants stated that:

> The purchase price per unit in the offering was $0.60. The warrants are exercisable six months following the date of issuance and will expire on the fifth anniversary of the initial date that the warrants become exercisable. The warrants will have an exercise price of $0.76. Gross proceeds of the offering are approximately $6.6 million.

> Ampio intends to use the proceeds from the offering for working capital and general corporate purposes, including funding of the Ampion™ clinical trial.

78. On June 22, 2017, Ampio issued a press release entitled "Ampio Injects First Patient in Final Pivotal Clinical Trial for Ampion™ BLA." The press release stated, in pertinent part:

> Ampio Pharmaceuticals, Inc. (NYSE MKT: AMPE) initiates dosing in the AP-003-C, Phase 3, single injection Ampion™ study. This study addresses the "unmet medical need" in Kellgren-Lawrence (KL) grade 4 osteoarthritis of the knee (OAK), evaluating the efficacy of Ampion™ for the treatment of pain, function, and Patient Global Assessment (PGA) in severe OAK. The study's primary endpoint follows the Outcome Measures in Rheumatology Clinical Trials (OMERACT) and Osteoarthritis Research Society International (OARSI) guidance, utilizing the OMERACT-OARSI responder rate. https://www.clinicaltrials.gov/ct2/show/NCT03182686

79. The June 22, 2017 Press Release was false and/or misleading because: (1) Defendants knew or should have known that the AP-003-C was not designed to be an adequate or well-controlled study because of its low participation and lack of a concurrent control group; (2) AP-003-C's design was not formally or informally approved by the FDA.

80. On October 18, 2017, Ampio announced in a press release the closing of third registered direct offering. The October 18, 2017 Press Release reported that the offering consisted of "7,709,400 shares of common stock at a purchase price of $0.875 per share for gross proceeds of approximately $6.75 million." Defendants stated that "Ampio intends to use the net proceeds from this offering for working capital and general corporate purposes, including funding of the Ampion™ clinical trial."

81. According to the Company's quarterly report for the quarter ended June 30, 2017, Ampio was in poor financial position. The Company ended the quarter with

stockholders' equity of $3.7 million and an accumulated deficit of $158.0 million. The quarterly report noted that there are substantial doubts about its ability to continue as a going concern. The Company also stated the following:

> The Company expects that its current cash resources and expected lack of operating cash flows will not be sufficient to sustain operations for a period greater than a few months from the date this Form 10-Q was available for issuance. The ability of the Company to continue its operations is dependent on management's plans, which include continuing to raise equity-based and debt financing. The Company is currently in negotiation with potential investors for financing. However, there is no assurance that the Company will be successful in raising sufficient capital.

82. On September 7, 2017, the Company announced that it was notified by the NYSE that it was not in compliance with continued listing requirements. Specifically, Sections 1003(a)(ii) and (iii) of the NYSE Code required a Company posting fiscal losses in recent years have a certain amount of shareholders equity. Ampio's shareholders' equity on June 30, 2017 ($3,734,756) was below that threshold, given that it reported losses over the previous five fiscal years.

83. Even though the PIVOT Trial that Ampio had just completed ***failed to meet its primary endpoint because it could not show a significant difference between Ampion and saline***, the AP-003-C trial was to be conducted ***without a placebo control group***. Some patients would be injected with saline, but Ampio would not be reporting data on them. Instead, Ampio would compare the results to historical data for all saline injections in Ampion studies. This trial would only accept participants with KL Grade IV OAK.

84. In the PIVOT Trial, Ampio received written guidance from the FDA that 460 participants were required. In the SPRING Trial, it enrolled 329 participants. As previously noted, in response to the SPRING Trial, the FDA required an additional trial adequately powered to confirm SPRING Trial's effect size.

85. To meet the FDA's directive, Ampio instead designed AP-003-C, which only had 164 participants and no concurrent control group.

86. Despite having several examples of trials that the Company knew the FDA considered to be adequate and well-controlled (the SPRING and PIVOT Trials), each with over 300 participants and a concurrent control group, the AP-003-C Trial was radically different in design from both. Ampio knew the importance of obtaining a SPA, having just obtained one for the PIVOT Trial. If the Company were to radically deviate in design from its previous adequate and well-controlled trials, the Company should have obtained an agreement from the FDA.

87. According to an FDA guidance on Drug Study Designs,[14] because it is relatively difficult to ensure historical control groups are comparable to the treated subjects, "use of historical control studies has been reserved for special circumstances, notably cases where the disease treated has high and predictable mortality . . . and those in which the effect is self-evidence (e.g., a general anesthetic)." Neither situation is applicable here, as OAK does not have a high mortality rate and the effect is of Ampion is not self-evident. The PIVOT study failed to show that Ampion was superior to saline.

88. Defendants consistently represented that, in creating and designing the AP-003-C trial, they relied and were in compliance with guidance received from the FDA. For example, when describing the design of the study in a prospectus supplement dated June 2, 2017, the company described their communications with the FDA per the following:

> In September and December 2016, we met with the Center for Biologics Evaluation and Research, or CBER, Division of the U.S. Food and Drug Administration, or FDA, to seek guidance on the best

---

[14] FDA, Drug Study Designs Guidance for Institutional Review Boards and Clinical Investigators, January 1998, *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/drug-study-designs.

> path forward to obtain a Biological License Application, or BLA for Ampion™ to treat patients suffering from pain caused by severe osteoarthritis of the knee. As a result of these meetings, we continued our discussions with the FDA into the first quarter of fiscal 2017 while analyzing the best way to proceed towards filing our BLA for Ampion.

89. In reality, while the FDA provided input, it never informally or formally approved AP-003-C. Instead, the agency did not respond when Ampio submitted the trial design for approval. As Defendant Macaluso explained in a March 7, 2017 conference call, the FDA presented Ampio with nine options for a second Phase 3 pivotal trial. Yet, Ampio did not use any of those options.

90. CW1, though he did not participate in the design of AP-003-C, stated that he was aware that proving efficacy by using historical data was difficult and left more room for interpretation than comparing the use of the drug to a placebo. CW1 also knew that the way only to ensure that the FDA would not decide that trial design was inadequate was to get a SPA. CW1 was a high-ranking employee who reported directly to Defendant Macaluso during his tenure.

91. Confidential Witness 2 ("CW2") worked at Ampio as a Clinical Project Manager from 2013 to March 2017, and as a Senior Regulatory and Clinical Project Manager from March 2017 to January 2018. CW2 was a study director for several clinical trials for Ampion, including AP-003-C. CW2 could not recall if the FDA provided sign off on the trial design prior to its commencement.

92. CW2 also noted that after a company submits a proposed trial to the FDA for review, the FDA has 30 days to respond. But, the FDA has no obligation to do so, and "may or may not get back to you." CW2 knew that it was "really hard" without a SPA to guarantee that the FDA would endorse the trial design, and did not know why Ampio did not obtain one for AP-003-C.

93. The FDA may elect to place a trial that is not adequate and well-controlled under clinical hold in a specific set of circumstances. Circumstances that could be pertinent here include: (i) the trial would place a subjects in unreasonable and significant risk; (ii) the investigators are not qualified; (ii) the investigator brochure is misleading, incorrect, or incomplete; (iii) the application does not contain sufficient information to assess the risks to the subjects; (iv) the trial is clearly deficient in its design to meet its stated objectives; (v) conducting the trial would conflict with another adequate and well-controlled trial; (vi) another trial strongly suggests the drug's ineffectiveness; (vii) another drug is already approved for the same issue with demonstrated better benefit; or (vii) the drug has already received marketing approval, or the sponsor is not pursuing marketing approval for the drug. [15] None of these conditions were present here.

94. The FDA is not obligated to stop a trial because there are not enough participants, or because a comparison to the proposed control does not adequately show the drug's effectiveness.

***Ampio Announces Results for the AP-003-C Trial***

95. On December 14, 2017, Ampio announced that its Phase 3 trial, AP-003-C, was successful, meeting both its primary and secondary endpoints:

> AMPIO PHARMACEUTICALS REPORTS POSITIVE RESULTS FOR BOTH PRIMARY AND SECONDARY ENDPOINTS OF PIVOTAL PHASE 3 TRIAL OF AMPION™ IN SEVERE OSTEOARTHRITIS-OF-THE KNEE (OAK)
>
> * * *
>
> ENGLEWOOD, Colo., December 14, 2017 — ***Ampio Pharmaceuticals, Inc. (NYSE MKT: AMPE) today reported that the Phase 3 clinical trial of Ampion™ met its primary endpoint with 71% of Ampion™ treated patients meeting the OMERACT-OARSI responder criteria, which exceeds the physician reported threshold***

---

[15] 21 CFR 312.42(b)(4)

> ***of 30% for a meaningful treatment in severe osteoarthritis of the knee (p < 0.001).***
>
> * * *
>
> If approved, Ampion™ would be the first intra-articular injection to treat the signs and symptoms of patients with severe osteoarthritis of the knee (Kellgren-Lawrence x-ray grade 4). In order to support a label for signs and symptoms, Ampion™ was asked to demonstrate clinical efficacy in a composite response of pain, function and be supported by quality of life.
>
> ***Ampion™ was well tolerated with treatment-emergent adverse events (TEAEs) comparable to those of placebo in all single-injection studies of Ampion™.*** There were no drug-related serious TEAEs associated with the Ampion™ arm. The safety and tolerability profile of Ampion™ is consistent with previous studies. To date, Ampion™ has been given to over 900 patients with no reported drug-related serious TEAEs.
>
> * * *
>
> ***"We are very pleased with the positive Phase 3 data as we believe that Ampion™ will address an unmet medical need, providing severely diseased patients a non-opioid option that not only reduces pain, but also improves function and quality of life in a meaningful way" said Michael Macaluso, Chairman and CEO, Ampio Pharmaceuticals. "We are hopeful that Ampion™ will serve as a safe and effective treatment for an incurable, progressive disease that afflicts 21 million people in the U.S. and over 200 million people worldwide who suffer from osteoarthritis. We look forward to working closely with the U.S. Food and Drug Administration (FDA) as we prepare to submit our Biologics License Application (BLA) for Ampion™."***

(Emphasis added.)

96. The December 14, 2017 Press Release was false and/or misleading because: (1) Defendants knew or should have known that the AP-003-C was not adequate or well-controlled because of its low participation and lack of a concurrent control group; (2) AP-003-C's design was not formally or informally approved by the

FDA; (3) hence, Ampio had not successfully completed two pivotal Phase 3 trials for Ampion's treatment of severe OAK.

97. On January 8, 2018, Ampio filed a Form 8-K with the SEC, attaching a slide deck used to update potential collaborators and attending shareholders at the J.P. Morgan Healthcare Conference, "the largest and most informative healthcare investment symposium in the industry."

98. Ampio's presentation stated that the FDA "requires 2 pivotal trials in support of a BLA submission [for Ampion,]" that the "FDA [previously] designated AP-003-A as a pivotal trial in support of a BLA for Ampion[,]" and that the "[r]ecent AP-003-C study . . . [which] successfully met its primary endpoint . . . serves as the second pivotal trial in support of BLA[.]"

99. Certain slides from that presentation state, in relevant part:




Ampion is a first-in-class, injectable biologic treatment for the signs and symptoms of severe OA of the knee and has successfully completed two pivotal studies
• Ampion is a low molecular weight (<5 kDa) ultra filtrate of 5% commercial human serum albumin for the treatment of signs and symptoms of severe OAK
– Single 4mL intra-articular injection with demonstrated efficacy at 12 weeks in multiple clinical studies
• Ampion is the first drug to demonstrate significant reduction in pain as well as improvement in function and patient global assessment in severe OAK
• Ampion has successfully completed two pivotal studies required for BLA submission:
✓ AP-003-A (Phase 3 single injection) – single dose of Ampion demonstrated statistically significant pain reduction vs. saline at 12 weeks across all OAK severities
– "Upon review of the dataset received on November 5, 2013, FDA concludes that Study AP-003-A can be considered as one of the two 'pivotal' trials required in support of a BLA." – FDA Minutes Nov. 2013
✓ AP-003-C (Phase 3 single injection) – single dose of Ampion demonstrated statistically significant effect and met primary endpoint with 71% of patients meeting OMERACT-OARSI responder criteria
– AP-003-C serves as a second statistically significant pivotal study for BLA submission
• Ampio has a clear path to approval and incorporated FDA guidance when designing AP-003-C to maximize regulatory and commercial success
• Novel MOA of Ampion biologic reduces pain signaling, inflammation and is involved in the promotion of healing
• Safe and well tolerated with no drug-related serious adverse events
– Most common AE's include: arthralgia injection site pain, headache, joint stiffness
Throughout its clinical development history, Ampion has demonstrated:
✓ Consistent patient outcomes across all trials
✓ Safe and well tolerated
✓ High relative efficacy in severe patients
Ampio PHARMACEUTICALS
11


Ampion has completed two pivotal studies required for FDA filing as well as several additional studies supporting efficacy as both a single and repeat injection
Study
Design
Pivotal Studies
AP-003-A Phase 3, n=329 (Mar 2013 - Aug 2013)
• Endpoint: WOMAC A pain reduction at 12 weeks compared to saline • Single IA injection – 4 mL, 10 mL Ampion vs. 4 mL, 10 mL Saline
AP-003-C Phase 3, n=168 (Jun 2017 - Dec 2017)
• Endpoint: OMERACT-OARSI responder rate at 12 weeks >30% • Single IA injection – 4 mL Ampion vs. 4 mL saline at ratio of 6:1
Supportive
AIK Phase 1/2b (May 2011- Apr 2012)
• Endpoint: WOMAC A pain reduction at 12 weeks • Single IA injection – 4 mL Ampion – 4 mL saline
AP-004 Phase 3 (Jan 2014- Jun 2014)
• Endpoint: WOMAC A pain reduction at 12 weeks • Single IA injection – 4 mL Ampion vs. 4 mL saline
AP-007 Phase 2 (Jun 2014- Feb 2015)
• Endpoint: WOMAC A pain reduction at 20 weeks • Multiple IA injections – 4 mL Ampion vs. 4 mL saline – IA injections (3 total) administered on day 0, week 2, and week 4
AP-008 Phase 3 (Oct 2014- Apr 2015)
• Endpoint: WOMAC A pain reduction at 20 weeks • Multiple IA injections – 4 mL Ampion vs. 4 mL saline – IA injections (3 total) administered on day 0, week 2, and week 4
AP-003-B Phase 3 (Sept 2015- Jun 2016)
• Endpoint: WOMAC A pain reduction at 12 weeks • Single IA injection – 4 mL Ampion vs. 4 mL saline
FDA Guidance
• FDA (CBER division) requires 2 pivotal trials in support of a BLA submission
• FDA designated AP-003-A as a pivotal trial in support of a BLA for Ampion
– Primary endpoint was reduction in pain compared to saline control at 12 weeks
"We accept the results of Study AP-003-A as one of the two phase 3 trials required to support a BLA." – FDA Minutes July 2015
• Recent AP-003-C study serves as the second pivotal trial in support of BLA
– Primary endpoint was OMERACT-OARSI response against 30% meaningful threshold
– Secondary endpoints included a composite endpoint of pain and function (OARSI 'controlled' responder), PGA response and comparison to historic saline
Ampion has demonstrated safety and efficacy in 2,007 patients across seven clinical trials and has completed two pivotal trials required for BLA submission
12
WOMAC A pain scale for all studies; NRS pain scale used in AIK. P-values based mean change of primary endpoint as defined in the protocol. / Bar-Or, et al. A randomized clinical trial to evaluate two doses of an intra-articular injection of LMWF-5A in adults with pain due to osteoarthritis of the knee. Plos One. 2014 Feb; 9(2). / Schwappach, et al. Preliminary trial of intra-articular LMWF-5A for osteoarthritis of the knee. Orthopedics. 2017 Jan 40(1).


In addition, AP-003-C Ampion demonstrated statistically significant effect across all OAK core efficacy measurements against historical saline controls
AP-003-C Supportive Data – Ampion vs. Historical Saline Controls
Pain
Function
PGA
Ampion (OARSI Responders)
Ampion (all)
Saline (historic)
Reduction/Improvement in Endpoint
p < 0.001
p = 0.0034
p < 0.001
53%
40%
25%
50%
38%
27%
45%
33%
15%
Ampion (OARSI Responders)
Ampion (all)
Saline
Ampion n=144; Saline n=208. ≥1.5 pain and function score for KL 4 patients required for eligibility in analysis for 'signs and symptoms' per FDA. Eligible saline patients across historic single-injection studies included in analysis.
Ampio PHARMACEUTICALS
16


AP-003-C and AP-003-A provide two statistically significant clinical trials for BLA submission that demonstrate significant effect on pain and core OAK measurements
AP-003-A
Pain Reduction in Severe OAK vs. Saline
AP-003-C
Pain Reduction in Severe OAK vs. Historic Saline
Percent (%) Reduction of Pain from Baseline
37%
36%*
35%
33%
38%
35%*
23%
21%
22%
25%
30%
18%*
Ampion
Saline
p = 0.05
p = 0.04
35%
36%*
41%*
40%*
29%
27%
30%
25%
Saline (historical)
p = 0.01
p < 0.001
p < 0.001
0
2
4
6
8
10
12
Study Week
Ampion demonstrated consistent, durable pain reduction vs. saline throughout the 12 week treatment period
AP-003-C: Ampion n=144; Saline n=208. AP-003-A: Ampion n=31 Saline n=41. ≥1.5 pain and function score for KL 4 patients required for eligibility in analysis for 'signs and symptoms' per FDA. Eligible saline patients across all single-injection studies included in analysis.
Ampio PHARMACEUTICALS
17




100. The Presentation was false and/or misleading because: (1) Defendants knew or should have known that the AP-003-C was not adequate or well-controlled because of its low participation and lack of a concurrent control group; (2) AP-003-C's design was not formally or informally approved by the FDA; (3) hence, Ampio had not successfully completed two pivotal Phase 3 trials for Ampion's treatment of severe OAK.

101. On March 6, 2018, the Company filed its annual report for the fiscal year ended December 31, 2017 on Form 10-K (the "2017 10-K") with the SEC, which provided the Company's annual financial results and position. The 2017 10-K was signed by Defendants Macaluso and Chilcott. The 2017 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Macaluso and Chilcott attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The 2017 10-K stated that the Company's "disclosure controls and procedures as of the end of the period covered by this report were effective."

102. In the 2017 10-K, the Company reported positive results for the AP-003-C study, stating in relevant part:

> In December 2017, we reported positive results for both the primary and secondary endpoints of our confirmatory single injection Phase III clinical trial of 168 patients. The 12-week study evaluated the responder rate of Ampion-treated patients as defined by the Osteoarthritis Research Society International ("OARSI") Standing Committee for Clinical Trials Response Criteria Initiative (OMERACT), which included pain, function, and patient global assessment in support of a label for the treatment of the signs and symptoms of severe OAK. Ampion met its primary endpoint with 71% of Ampion treated patients meeting the OMERACT-OARSI responder criteria, which exceeds the physician reported threshold of 30% for a meaningful treatment in severe osteoarthritis of the knee. Responders experienced, on average, a 53% decrease in pain as measured by WOMAC A and a 50% improvement in function as measured by WOMAC C and a 45% improvement in quality of life as measured by Patient Global Assessment (PGA). In the secondary endpoints, Ampion treated patients achieved statistical significance in a composite endpoint of pain and function from baseline in both categories at 12 weeks, which was supported by an increase in quality of life as measured by patient global assessment (PGA). When treated with Ampion, patients experienced significant improvement in a composite endpoint of pain and function compared to all severely diseased saline-treated patients in historical Ampion phase III clinical trials. We believe this data supports Ampion's ability to address an unmet medical need and provide patients with a meaningful, non-opioid treatment that improves pain, function and quality of life.
>
> * * *
>
> Our primary focus in fiscal 2018 is advancing the clinical development of our core asset: Ampion. ***In December 2017, we successfully completed our confirmatory single injection Ampion trial, with 71% of Ampion treated patients meeting the OMERACT-OARSI responder criteria. This percentage exceeds the physician reported threshold of 30% for a meaningful treatment in severe osteoarthritis of the knee. With these positive results, we plan to file the BLA during fiscal 2018.***

(Emphasis added.)

103. The 2017 10-K was false and/or misleading because: (1) Defendants knew or should have known that the AP-003-C was not adequate or well-controlled because of its low participation and lack of a concurrent control group; (2) AP-003-C's design was not formally or informally approved by the FDA; (3) hence, Ampio had not successfully completed two pivotal Phase 3 trials for Ampion's treatment of severe OAK.

**The Truth Emerges**

104. On August 7, 2018, after the market closed, Ampio announced updated business disclosures relating to its AP-003-C Trial, stating in relevant part:

> With respect to FDA review of Ampion and our completed and ongoing clinical trials, including the AP-003-A and AP-003-C trials, we have been and expect to continue to be engaged in meetings and correspondence with the FDA about the product, its manufacturing, and the preclinical and clinical testing necessary to support Ampion's safety and efficacy. We met with the FDA in July 2018 and have received a letter in response thereto. In the letter, the FDA stated that it considers the AP-003-A trial to be an adequate and well-controlled clinical trial that provides evidence of effectiveness of Ampion and can contribute to the substantial evidence of effectiveness necessary for approval of a BLA, but that as a single trial the AP-003-A study alone does not appear to provide sufficient evidence of effectiveness to support a BLA.
>
> ***Despite our belief that the APC-003-C trial design was based on FDA guidance and feedback and consistent with FDA precedent for similar products (in intended use, in origin, and in regulatory pathway), which we reiterated with the FDA multiple times, the FDA does not consider the AP-003-C trial to be an adequate and well-controlled clinical trial. The FDA recommended that we perform an additional randomized trial with a concurrent control group and that we request a Special Protocol Assessment to obtain FDA concurrence of the trial design before beginning the study.*** We plan to continue to discuss with the FDA the necessity of conducting this additional trial, as we believe the current body of data is sufficient to submit the BLA.

(Emphasis added.)

105. That same day, Ampio held a conference call to discuss its regulatory update. During the call, Defendant Macaluso elaborated on the FDA's decision, explaining that the FDA had determined that the trial was deficient because, among other things, it did not have a concurrent control group:

> The last review team has taken the position that this clinical trial should have been designed to include a concurrent control group. What is a concurrent control group? A current (sic) [concurrent] (00:12:57) control group could be a superiority to saline, a non-inferiority to saline, a non-inferiority to hyaluronic acid or a steroid, it could even be a sham injection. So I'll read it again just so you know what that word means.
>
> ***The last review team has taken the position that this clinical trial should have been designed to include a concurrent control group rather than a historic control group drawn from all of our Ampion clinical trials and the director of OTAT has recommended that we request a Special Protocol*** Assessment, an SPA, to ensure there will be no confusion, to eliminate the confusion between Ampion and OTAT, and Ampion in any trial design.

(Emphasis added.)

106. During the call, Defendant Macaluso revealed that the FDA had not actually commented on the trial design Ampio submitted, but, rather, the agency did not respond:

> ***The FDA either makes a comment to the trial design or stops the trial within the designated period. They neither commented nor stopped the trial. So***, therefore, we believe we completed the trial exactly as we are supposed to.

(Emphasis added.)

107. During the call, Defendant Macaluso provided further color on the FDA correspondence and subsequent rejection:

> I think I understand why they are questioning the trial design and I could go back and ***look at prior correspondence and things from the agency that would show that maybe we didn't pay attention***. But in order for the agency to understand that, especially going through reorganization, it's important that we're able to show them how we got to where we are. And then, of course, ask them if they're not accepting that, why they didn't stop the trial or why didn't they correct it when we sent it to them for review?
>
> * * *
>
> But if they did do that, so the FDA – here are some more quotes from the FDA: exploratory analysis of KL 4 subgroups shows promising effect; FDA acknowledged methodological challenges in conducting the clinical trial in which the active control was not a licensed product. In other words, there's nothing approved for KL 4 patients, so what would be the appropriate trial design? ***When you say a non-inferiority to saline is acceptable in that file, a sham injection is acceptable, a non-inferiority to steroids or hyaluronic acids could be acceptable, those are all relatively small, inexpensive trials. They could be quickly conducted.*** However, we contend that we did way more than they're asking us to do, way more. And what we've shown is far more valuable. Now, we just need a little bit more time to get that point across.

(Emphasis added.)

108. Confidential Witness 3 ("CW3") was a Quality Specialist at Ampio from April 2018 until July 2019. CW3 stated that Defendant Macaluso held a companywide meeting to inform employees of the FDAs decision.

109. According to CW3, the FDA also informed Ampio that, in addition to lacking a concurrent control group, the number of participants in AP-003-C was too few.

110. On this news, shares of Ampio fell $2.25 per share or over 78% to close at $0.61 per share on August 8, 2018. Shares continued to fall another 21.3% the next day, closing at $0.48 per share on August 9, 2018.

## POST CLASS PERIOD EVENTS

111. Following the August 7, 2018 disclosure, on August 9, 2018, Ampio issued a press release announcing the pricing of a public offering of common stock and warrants. The August 9, 2018 Press Release reported that Ampio "underwritten public offering of 20,000,000 shares of its common stock and warrants to purchase up to 20,000,000 shares of common stock, at a combined purchase price of $0.40 per share of common stock and accompanying warrant, with anticipated gross proceeds of $8.0 million," before deducting expenses. Ampio expected the offering to close on August 13, 2018. Defendants stated that:

> Ampio intends to use the net proceeds from this offering for working capital and general corporate purposes, including continued preclinical development of Ampion and funding an Ampion clinical trial, if required.

112. On June 19, 2019, Ampio issued a press release announcing the closing of a public offering. The June 19, 2019 Press Release reported that Ampio "issued 30,000,000 shares of common stock at an offering price of $0.40 per common share for aggregate gross proceeds of $12.0 million, before placement agent fees and other offering expenses." Defendants stated that:

> The Company intends to use the net proceeds from this offering for the full cost of its AP-013 clinical trial, titled "*A Randomized, Controlled, Double-Blind Study to Evaluate the Efficacy and Safety of an Intra-Articular Injection of Ampion in Adults with pain Due to Severe Osteoarthritis of the Knee*," pursuant to its recently announced Special Protocol Assessment and for other general corporate purposes.

113. On June 14, 2019, Ampio announced it received a SPA from the FDA for its new Phase 3 trial for Ampion. As of December 10, 2019, the trial is underway.

114. The new trial, numbered AP-013, has over 1000 participants. The trial will use a concurrent control group: a saline solution as a placebo comparator.

115. The primary outcome measures are patient improvement in pain and function for those administered with Ampion as compared to the saline control.[16] The

[16] https://clinicaltrials.gov/ct2/show/NCT03988023

secondary outcome measures are change in patients' assessment of disease severeity, pain scale, use of analgesia, and number of treatment emergent adverse events.

116. A chart comparing the SPRING Trial, PIVOT Trial, AP-003-C, and AP-013 is attached as Exhibit 2. The chart demonstrates the striking similarities between the SPRING Trial, PIVOT Trial, and AP-013, and the corresponding dissimilarities of each to AP-003-C. The PIVOT Trial and AP-013 were both the product of a SPA.

## ADDITIONAL ALLEGATIONS DEMONSTRATING SCIENTER

117. An article published on Seeking Alpha cites a confidential management presentation[17] that indicates that Ampio's intention in designing AP-003-C was to conduct a trial that nearly guaranteed success. Ampio predicted a 99% chance of the trial meeting its primary endpoint, which was a response rate greater than a 30% benchmark threshold that the Company itself had created. The PIVOT Trial with the SPA failed because there Ampio did not show a superiority to saline. Yet, the PIVOT Trial would have succeeded under this endpoint. Ampio, under pressure to deliver results, instead chose to conduct a study with an endpoint that it knew would easily be met.

118. This is confirmed by Defendant Macaluso's statements in a December 14, 2017 conference call. There, he stated that because of Ampio's positive results in the trial, the Company would be able to avoid some dilution from additional money raising and was also attracting acquisition and partnership interest from other pharmaceutical companies:

> I'm going to tell you we'll do everything we can so we do not have to raise any dilutive capital. #1 we have enough to last the next 5 or 6 months. ***Our largest warrant holders said they would exercise their warrants if the data was good, so we can expect that.***
>
> * * *

[17] https://seekingalpha.com/article/4149652-ampio-pharmaceuticals-overhyped-and-undercapitalized

> ***I think we've had 18 pharma meetings so far, including a few this week. 55 companies worldwide have expressed interest, many of these were awaiting the outcome of this trial. I would expect that they'll all take a meeting now.*** All of our options are open, acquisition, partnering, licensing, and even doing it ourselves but with a twist.
>
> * * *
>
> I think that depending on the size of the pharma and their intentions, they would perhaps want to file the BLA themselves, name it, and time it based on their needs for bringing the drug to market. That has generally been the flow of our conversations with the larger pharmaceutical companies. The smaller pharmaceutical companies that aren't small but smaller than the top 7 or 8, their interest is more about licensing or partnering or other sort of considerations. So we have slowed down the BLA processing a little bit based on guidance from Locustwalk and their suspicion that pharma might want to do the filing themselves.

(Emphasis added.)

119. On May 10, 2019, Ampio filed its Quarterly Report on form 10-Q with SEC for the quarter ended March 31, 2019. There, Ampio disclosed that it and certain of its officers and directors received subpoenas in April 2019 "in an investigation relating to the trading of our securities around two significant corporate announcements that resulted in material declines in the market price of our stock."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

120. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Ampio during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

121. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ampio securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

122. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

123. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

124. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of Ampio securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

125. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

126. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Ampio securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold Ampio securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

127. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

128. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants**

129. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

130. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

131. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

132. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Ampio securities during the Class Period.

133. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

134. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

135. As a result of the foregoing, the market price of Ampio securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of

the market price of Ampio securities during the Class Period in purchasing Ampio securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

136. Had Plaintiffs and the other members of the Class been aware that the market price of Ampio securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Ampio securities at the artificially inflated prices that they did, or at all.

137. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

138. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Ampio securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

139. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

140. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

141. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct

promptly any public statements issued by the Company which had become materially false or misleading.

142. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ampio securities.

143. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

144. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demands a trial by jury.

Dated: December 10, 2019

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (pro hac vice)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

*Lead Counsel for Lead Plaintiff*